TERRI KEYSER-COOPER
Law Office of Terri Keyser-Cooper
NV Bar #3984
3590 Barrymore Dr.
Reno, NV 89512
Tele (775) 337-0323
keysercooper@lawyer.com

IAN E. SILVERBERG
Law Office of Ian E. Silverberg
NV Bar #5501
227 Clay St.
Reno, NV 89501
iansilverberg&yahoo.com

*Attorneys for Plaintiff Shannon Branson*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| SHANNON T. BRANSON | Case No. |
| Plaintiff, | COMPLAINT |
| vs. | Jury Demand |
| Walgreen Co. | |
| Defendant. | |

_____/

## JURISDICTION AND VENUE

1.    This Court has jurisdiction of this action pursuant to 28 U.S.C. Sections 1331, 1343, 2201; Title I of the Americans With Disabilities Act ("ADA") 42 U.S.C. §§12101-12214; and the ADA Amendments Act of 2008 (ADDAA).

2.    Venue in this action is appropriate in the Northern District of Nevada pursuant to 28 U.S.C Section 1391(b).

3.    Notice has been provided to the Equal Employment Opportunity Commission and a

Right-to-Sue Letter for the employment claim was issued on March 27, 2015. A true and correct copy of the Right-to-Sue Letter is attached to this Complaint (Attachment 1).

**PARTIES**

4.      Plaintiff SHANNON T. BRANSON ("BRANSON"), is and at all relevant times was a resident of Fernley, Nevada.

5.      Defendant WALGREEN CO., ("WALGREEN") is a corporation, licensed to do business in the State of Nevada in an industry affecting commerce with 15 or more employees. WALGREEN maintains multiple stores in Nevada and a store in Fernley, Nevada. WALGREEN maintains a Nevada resident agent for service of process and abides by all laws of the State of Nevada.

6.      BRANSON alleges Title I of the ADA applies to WALGREEN and imposes upon WALGREEN the general rule that no employer may discriminate against an employee on the basis of his or her disability.

7.      BRANSON alleges that WALGREEN and/or its agents, employees, and servants performed, participated in, aided and/or abetted in some manner the acts averred herein, which proximately caused the damage averred below and is liable to BRANSON for the damages and other relief sought herein. BRANSON further alleges that WALGREEN ratified, approved, delegated, and authorized all actions of its agents, employees, and servants.

**FACTUAL ALLEGATIONS**

8.      BRANSON, 31 years old, suffered an accidental gunshot wound to the head when he was 12 years old, which caused him to spend four months in a hospital and miss a year of school. His diagnosis was brain injury with multiple physical disabilities. BRANSON fought to survive—90 percent of all persons with his injuries die and of the persons who survive, 90 percent have a severely reduced quality of life. BRANSON was told he would never walk again. He was told he would never finish

school.

9.    BRANSON struggled and persevered—eventually walking with leg braces and graduating from high school. He was told he would never drive a vehicle because his ankles were frozen but he applied himself to master driving with hand controls and passed his driver's exam.

10.    BRANSON'S brain paralyzed his left side paralyzed and left his ankles frozen but with long term physical therapy and perseverance he was able to mitigate the damage and learn to walk. First he was in a wheelchair, then he learned to walk with "sticks" attached to his arms, and then a cane. He now has leg braces on his legs because of his frozen ankles, but can walk without assistance, albeit at a much slower pace than an able bodied person. He will require the leg braces for the rest of his life.

11.    BRANSON'S permanent disabilities are obvious. He walks at approximately 25 percent the speed of an able bodied person. Further, because of his frozen ankles, he cannot crouch, run, climb, squat, or perform tasks that require balancing or using a ladder.  In addition, BRANSON has difficulty with bending, pushing, pulling, balancing, and lifting items more than 20 to 30 pounds. Further, BRANSON has only sixty percent use of his left arm. Finally, BRANSON'S speech, while easily understandable, demonstrates a noticeable speech impediment.

12.    BRANSON moved from Crestline, California to Fernley, Nevada to live with his grandparents in 2011. In early 2013 BRANSON became a client of the Nevada Department of Employment Training and Rehabilitation ("DETR"). DETR tested him, trained him, assessed his physical, vocational and psychological abilities and worked with him on his interview skills—all for the purpose of assisting him to find employment.

13.    On or about early August 2013, DETR agents and/or representatives found BRANSON a job at WALGREEN in Fallon, Nevada. His job included ringing up sales, stocking shelves, using the "Telzon" machine for inventory control, assisting customers, and maintaining the electronics, candy,

and tobacco areas of the store and cleaning restrooms. BRANSON completed all training required by WALGREEN including: the Deficit Reduction Act/False Claims Act Policy, the Sale of Alcoholic Beverages Policy, and the Nevada Alcohol Server Training. He worked under "Nathan" at the Fallon, Nevada store and did well, filling in for sick employees and becoming a special favorite with elderly clientele. BRANSON greatly enjoyed the job and received praise for his performance. Senior citizens routinely required assistance with products for toileting and showering—items BRANSON had personally used and could easily assist with.

14.     At all times WALGREEN had actual notice that BRANSON was disabled, and that BRANSON had a physical impairment that substantially limited one or more major life activities. BRANSON's known symptoms of disability were obvious manifestations of an underlying disability. BRANSON'S disabilities were presented to WALGREEN in his initial interview. It was explained to WALGREEN that BRANSON had difficulty walking because of his frozen ankles and would wear leg braces from his knees to his ankles. WALGREEN was informed during the hiring and interview process that BRANSON could not crouch, run, climb, squat, or perform tasks that require balancing or using a ladder. WALGREENS was further on notice that BRANSON had difficulty with bending, pushing, pulling, or lifting items more than 20 to 30 pounds. Finally, WALGREEN was on notice that BRANSON had only sixty percent use of his left arm. His slight speech deficient was obvious.

15.     At all times BRANSON was a qualified individual capable of performing the essential functions of the job he was given at WALGREEN.

16.     On or about January 2014 BRANSON transferred, at his request, to the WALGREEN store in Fernley, Nevada located at 1280 Highway 95A North. BRANSON requested the transfer because the Fernley store was five minutes from his home and convenient. BRANSON'S job tasks at the Fernley store remained identical to his job tasks at the Fallon store. His supervisor at the Fernley

store was store manager "Angelique." The assistant manager was Ludwig Joseph ("Joseph").

17.     BRANSON got along well with Angelique from the start. Angelique trained him in how she wanted things done and complimented him consistently on his performance. Angelique told BRANSON that the area he was responsible for in the store, the cigarette and candy area, had never looked "so good" and he was doing an excellent job. BRANSON got along well with customers, as he knew many of the elderly customers from his former days as a volunteer at the Fernley Senior Center and was able to assist with special needs of the elderly in toileting and showering.

18.     However, BRANSON'S experience with assistant manager Joseph was problematic from the start. Joseph treated him differently from and worse than other employees:

- Joseph would be consistently friendly to store employees but yell at BRANSON;

- Joseph would courteously answer questions about coupons and sale items from other store employees but would yell at BRANSON and berate him for raising identical questions about coupons and sale items;

- Joseph would consistently deny BRANSON'S requests for more hours, yelling at BRANSON and saying "quit bothering me" and "don't ask me again";[1]

- Joseph hired lesser-qualified employees, especially younger women under the age of 21 who could not ring up sales for alcohol and cigarettes. When these young women worked the registers and a customer presented with alcohol or tobacco items, the young women would call out a particular code and BRANSON or another employee would have to immediately rush to help out—this consumed extra time; and,

- Joseph refused to allow BRANSON to perform any other function in the store except remaining behind the register. Angelique trained BRANSON in all tasks and permitted him to do the tasks but Joseph yelled at him when BRANSON asked to stock shelves, use the Telzon machine, or clean the bathrooms.

19.     It is alleged that Joseph spoke to BRANSON in a harsh manner, different from and worse than, the manner in which he spoke to other persons because Joseph did not like having a disabled person as a store employee.

---

[1] BRANSON spoke to Angelique about more hours and/or a promotion to full time. Angelique responded by informing BRANSON that Joseph was in charge of all scheduling.

5

20.     It is alleged that Joseph harbored animus for BRANSON and was embarrassed by his presence in the store, choosing to have incompetent, lesser-qualified persons working in the store rather than promoting BRANSON to full time employment or giving him additional hours.

21.     BRANSON did not receive discipline, warnings, or counseling for misconduct of any kind at either the WALGREEN store in Fallon or in Fernley. He consistently mentioned to Joseph and Angelique his willingness to work any shift at any time and to come in at the last minute if or when an employee was a "no show."

22.     BRANSON was very happy with his work at the Fernley WALGREEN. From January through August 2014 he blossomed. He enjoyed the compliments he received from Angelique, the interaction with customers, and the tasks he was assigned—even the cleaning of the bathrooms. BRANSON'S work at WALGREENS made him feel like a useful, productive member of the community.

23.     BRANSON's only worrisome note was Joseph's continued unpleasantness, unfairness, and yelling at him. BRANSON was uncomfortable with Joseph's conduct as he noticed Joseph was very friendly and pleasant to all other store employees.

24.     BRANSON was outstanding in selling the "suggestive sales" items placed at or near the registers. Suggestive sales items required the cashier to mention to the customer that specific items were on "special sale."

25.     During BRANSON's tenure working at WALGREEN, he was the healthiest he had been ever in his life. As a result of the gunshot wound to his head he has been seeing physical therapists, neurologists, and pain specialists as well as other doctors all of his life. During his year at WALGREEN his doctor visits were extremely reduced and his lifetime of migraines headaches were gone. He was virtually pain free for the first time in his life.

26.     On August 8, 2014, BRANSON'S supervisor, store manager Angelique, worked her last day at the store. On August 9, 2014 she would take a pregnancy leave. Assistant store manager Joseph would take her place as store manager during her pregnancy leave.

27.     August 8, 2014 was an especially good day for BRANSON. Assistant managers "Zack" and "Patrick" had congratulated him on his high achievement in the area of "suggestive sales." Zack and Patrick showed BRANSON emails from WALGREEN corporate offices stating BRANSON was the "top performer" in suggestive sales. The emails thanked BRANSON and informed him he was "number one" in entire WALGREEN district in the area of suggestive sales.

28.     August 9, 2014 was an especially bad day for BRANSON. He was at his home preparing to go to WALGREEN for his day's work when he received a phone call from Joseph. It was Joseph's first day as store manager. Joseph told BRANSON "Don't come in to work today, you're under investigation." When BRANSON inquired: "What happened, what is the problem?" Joseph refused to answer, insisting in a very unpleasant voice that BRANSON should not come into the store.

29.     BRANSON was shocked and devastated. He had no idea what could be the problem. He drove to WALGREEN to ascertain the problem. If he was in "trouble" he wanted to know why. It was difficult for him to fathom how he could be a top performer one day and in trouble the next. When BRANSON approached Joseph the new store manager told him, "You're not supposed to be here." Joseph stated, "A customer called the corporate office last night to complain that you charged her $1.25 for a bag of potato chips and did not give her the chips." Joseph stated an investigation into the matter would be conducted and ordered BRANSON out of the store, screaming at him to "get out" immediately. BRANSON left but remained highly agitated at the false accusations.

30.     On or about August 15, 2014, Joseph called BRANSON requesting that he "come down" to WALGREENS. When BRANSON arrived, Joseph told him he was "fired." Joseph accused

him of cheating the woman out of her bag of potato chips. Joseph also accused BRANSON of ringing up sales for other customers and not giving them their chips. He accused him of ringing up sales under the counter so customers "could not see" they were being charged for multiple bags of potato chips. Joseph told BRANSON that "corporate" had "viewed" tapes of him ringing up sales beneath the register so customers cold not see what he was doing. Joseph claimed corporate wanted BRANSON fired for cheating customers out of chips by charging them, collecting the money, putting the money in the register, and not giving the chips to the customers.

31. BRANSON was shocked. He denied the accusations on the spot. He told Joseph the accusations were not true. He was not cheating customers by falsely ringing up their items and not providing the items to them. BRANSON asked who had made those accusations. Joseph refused to answer, insisting one woman had not been given her chips.

32. **Joseph did not accuse BRANSON of:**

- Failing to ring up potato chips sales in WALGREEN register;

- Failing to put money from the sale of chips in WALGREEN register;

- Cheating WALGREEN out of sales;

- Failing to have the cash receipts balance;

- Cheating WALGREEN in any way;

- Stealing potato chips;

- Eating potato chips; or

- Taking home potato chips.

33. Joseph's sole accusation, the basis for the termination, was that **one woman** on one occasion complained about not receiving one bag of chips. Joseph did not allege there were any other complaints from any other customers.

34.     Joseph told BRANSON he was a "thief" and "ripping off" customers. Joseph ordered BRANSON out of the store. Joseph told BRANSON if he did not leave the store immediately, he would call the police.

35.     Joseph refused to provide the name of the sole customer, or any other proof as to the existence of this one woman who allegedly did not receive her bag of potato chips.

36.     When BRANSON inquired about his pay, Joseph said, "I've already put the payroll in."

37.     Later on August 15, 2014, Joseph called BRANSON once again to come into the store. At that time Joseph pulled cash out of a register and gave it to BRANSON on the spot without an accounting. BRANSON had no idea what he was being paid or how much was due. He had no idea if the amount Joseph gave him was the correct amount. When BRANSON asked about his accrued vacation pay, Joseph said, "That's all you get" screaming at him to "get out" of the store and "never" come back.

38.     BRANSON alleges these allegations by Joseph regarding ringing up chips for customers and not giving them their chips is false. BRANSON alleges he at all times gave or packaged all items purchased by customers to them directly. BRANSON further alleges, if he was charging customers for items he did not give them, other customers would have complained. If BRANSON was doing this to multiple customers, as alleged by Joseph and WALGREENS, customers other than the one who allegedly complained would surely have complained.

39.     BRANSON alleges these allegations by Joseph are false because there is no reason for him to ring up a sale for a customer and not give the customer the items. On its face it is patently absurd because BRANSON had nothing to gain by such conduct. BRANSON had no reason to charge customers for items, ring up sales, and fail to provide the items to the customer. In his year of working for WALGREEN he had never before been accused of such conduct.

40.     BRANSON alleges these allegations by Joseph, on the first day prior store manager Angelique has left the store, were false, made by Joseph for the purpose of fabricating a reason to fire him because of his dislike for BRANSON'S disability. From Joseph's prior conduct with BRANSON, it is easy to infer Joseph waited for the first opportunity he had to terminate BRANSON. That first opportunity came on the first day of store manager Angelique's pregnancy leave. The minute Angelique was out of the store BRANSON was disposed of.

41.     BRANSON alleges that Joseph fabricated the notion that he was ringing up sales for customers and not providing the customers with their items as pretext for illegal discrimination.

42.     BRANSON alleges he was discriminated against in the terms and conditions of his employment by not being promoted to a full time position, or being given additional hours, when lesser-qualified employees were receiving such positions and additional hours,. BRANSON alleges that this failure to promote on his disability.

43.     BRANSON alleges he was discriminated against in his termination because of his disability in that the reason for his termination was pretextual, fabricated for the sole reason of discriminating against him based on his disability.

44.     BRANSON alleges that his disability was the catalyst that prompted Joseph to terminate his employment and a factor without which WALGREENS and/or its agent Joseph would not have acted.

45.     BRANSON alleges that Josephs display of anger at him for questioning sale items, use of coupons or other reasonable questions while not displaying anger at others for asking the identical question is evidence of animus against BRANSON based on his disability.

46.     BRANSON alleges that Joseph acted with intentional malice and with reckless indifference to BRANSON's federally protected right to be free from disability discrimination.

47.     After BRANSON's termination he deteriorated physically. He was morbidly depressed, almost catatonic. He could not walk and was back in a wheelchair. His migraine headaches became intense, painful and persistent—no medication could help. He suffered in pain all day and all night and could not sleep. The pain affected his ability to walk, to see, and to talk. His collapse was so total he needed help to get to and from the bathroom. He suffered several emergency trips to the Banner Churchill Community Hospital; multiple treatments by Jorge Lopez, M.D., a neurologist and extensive treatment by the Nevada Advanced Pain Specialists.

## FIRST CAUSE OF ACTION

### (Title I of the ADA – Discriminatory Termination)

48.     Plaintiff SHANNON BRANSON realleges all preceding paragraphs and incorporates them by reference.

49.     Title I of the ADA prohibits any employer from terminating an employee on the basis of disability.

50.     Plaintiff BRANSON is disabled.

51.     Plaintiff BRANSON, was a qualified individual capable of performing the essential functions of the job he was offered at WALGREENS.

52.     Plaintiff BRANSON was unlawfully and intentionally discriminated against because of his disability in his termination.

53.     Defendant WALGREEN anticipated legitimate non-discriminatory reason for BRANSON's termination is false and absurd on its face, that he intentionally charged a customer for a bag of potato chips and intentionally did not give her the bag of potato chips.

54.     As a direct and proximate result of Defendant WALGREEN's actions, BRANSON has suffered economic loss including, but not limited to, back pay, front pay, vacation pay, physical pain and

suffering, emotional pain and suffering, and extensive medical and prescription costs. In addition BRANSON has suffered the indignity of discrimination, the invasion of the right to be free from discrimination which has manifested in outrage, severe anxiety about his future, damage to his reputation, disruption to his personal life, and loss of enjoyment of the ordinary pleasures of everyday life. In addition to compensatory damages, plaintiff seeks punitive damages as well as attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### (Title I of the ADA - Failure to Promote)

55.     Plaintiff realleges and incorporates by reference herein the allegations above contained.

56.     Plaintiff BRANSON is a member of a protected group: He is disabled. He applied for and was qualified for promotion to full time work and/or additional hours. He was rejected despite his superior qualifications and job performance. Individuals were hired in place of him for full time positions and/or additional hours that were, outside the protected group and lesser-qualified.

57.     As a direct and proximate result of the aforedescribed unlawful and malicious conduct by defendant, Plaintiff suffered economic loss, grievous bodily harm and emotional distress in violation of Title I of the ADA.

58.     As a direct and proximate result of Defendant WALGREEN's actions, BRANSON has suffered economic loss including, but not limited to, back pay, front pay, vacation pay, physical pain and suffering, emotional pain and suffering, and extensive medical and prescription costs. In addition BRANSON has suffered the indignity of discrimination, the invasion of the right to be free from

discrimination which has manifested in outrage, severe anxiety about his future, damage to his reputation, disruption to his personal life, and loss of enjoyment of the ordinary pleasures of everyday life. In addition to compensatory damages,

59.     plaintiff seeks punitive damages as well as attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against defendant as follows:

(a)     For compensatory damage in an amount to be determined;

(b)     For economic damage including past, present, and future losses in an amount to be determined;

(c)     For physical damage including medical bills and treatments in an amount to be determined;

(d)     For punitive damages to the extent permitted by law;

(e)     For attorneys' fees and costs incurred herein;

(f)     For leave to amend this complaint should same become necessary;

(g)     For such other legal and equitable relief as this Court may deem appropriate.

DATED:     This __8__ day of April 2015

TERRI KEYSER-COOPER
*Attorney for Plaintiff Shannon Branson*

13

EEOC Form 161-B (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To:  Shannon Branson
     237 Poppy Hills Drive
     Fernley, NV 89408

From:  Los Angeles District Office
       255 E. Temple St. 4th Floor

       Los Angeles, CA 90012

☐   *On behalf of person(s) aggrieved whose identity is*
    *CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 34B-2014-01317 | Karrie L. Maeda,<br>State & Local Coordinator | (213) 894-1100 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request.  Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

☐   More than 180 days have passed since the filing of this charge.

☒   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒   The EEOC is terminating its processing of this charge.

☐   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

☐   The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice.  Otherwise, your right to sue based on the above-numbered charge will be lost.

☐   The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Rosa A. Viramontes*
_____          March 27, 2015
**Rosa M. Viramontes,**                      *(Date Mailed)*
**District Director**

Enclosures(s)

cc:   Leslie Borre
      Sr. Attorney
      WALGREEN CORPORATION
      102 Wilmot Road, M/S 1259
      Deerfield, IL 60015

      Terri Keyser-cooper, Esq.
      LAW OFFICE OF TERRY KEYSER-COOPER
      3590 Barrymore Drive
      Reno, NV 89512

Attachment 1